STATE OF NEBRASKA, APPELLEE, V. JERRY L. ROACH, APPELLANT.
452 N.W.2d 262

Filed March 2, 1990.    No. 89-472.

Dennis R. Keefe, Lancaster County Public Defender, and Michael D. Gooch for appellant.

Robert M. Spire, Attorney General, and Kenneth W. Payne for appellee.

HASTINGS, C.J., WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and RONIN, D.J., Retired.

CAPORALE, J.

Following a bench trial on stipulated facts, the defendant-appellant, Jerry L. Roach, was found guilty of two misdemeanors, the attempted possession of cocaine in one instance and the attempted possession of psilocyn in the other, in violation of Neb. Rev. Stat. §§ 28-201 and 28-405 (Reissue 1989) and 28-416(3) (Cum. Supp. 1988). Although in stating his single assignment of error Roach asserts the district court erred in refusing to sustain his motion to suppress certain evidence, the real question is whether that court erred in overruling Roach's trial objections to the receipt of the challenged evidence. *State v. DiBaise*, 232 Neb. 217, 440 N.W.2d 223

(1989). We affirm.

At 2:07 on the morning of May 6, 1988, Officers Amen and Bashus were dispatched to Lois Simpson's Lincoln residence in response to her complaint that there were persons in her home using narcotics and refusing to leave as requested. Simpson was the sole renter of the premises and lived there with her two children.

Upon their arrival, Simpson met the officers at the front door, gave them permission to enter, and told them the two persons she complained about were in the basement bedroom. At some point, Simpson told the officers she did not know "for sure, but she thought they were using drugs." She also at some time informed the officers that one of the persons in the basement, Melvin Brown, was her boyfriend, and although she had asked the two to leave, she did not know "for sure if [Roach] had heard her . . . ."

In any event, after obtaining Simpson's permission to go to the basement, Amen proceeded to the closed bedroom door and pushed it open until it came up against a chair placed directly behind it. Amen then saw a man, Brown, scraping from a desk something Amen could not identify, and saw a second man, Roach, seated at the desk. Amen noted the odor of something, such as a match, having been burnt. When he asked the two to open the door, Brown said, "Just a minute, just a minute," and hesitated "somewhat." During this exchange, Amen could not see what was being done behind the door but noticed a cotton ball on the desk. After Amen entered the bedroom, he sent Brown out of the room to talk with Bashus, who had remained in the hallway.

Amen then began to question Roach. When asked what they were doing, Roach replied, "nothing," and lit a cigarette. Upon being asked for identification, Roach produced an employment document containing a photograph of himself and said he had no other identification. In response to Roach's question as to what the problem was, Amen "informed him three times that . . . SIMPSON . . . had requested them to leave and they did not leave, that they refused to do so, that they were trespassing." Roach replied that he was never told to leave, that he was just giving Brown a ride.

At that point, Amen asked Roach to put his hands against the wall and patted him down to see if he had any weapons on him. Although Amen found no weapons, he did find a wire approximately 6 inches long in Roach's left jacket pocket, which wire had a burnt end and contained some burnt substance that Amen thought to be cotton. Roach denied knowing what the substance on the wire was, denied that it was his, and denied having any drugs. Roach appeared to Amen "to be moving around quite nervous," so Amen asked him to stand still.

In the meantime, Brown had been creating a disturbance upstairs; thus, Bashus arrested Brown for trespassing, called another unit to the scene, and apparently placed Brown in a vehicle and then went to the basement to join Amen and Roach. Amen thereupon told Roach he had to leave, and Roach said he would, bending down in front of Amen and picking up a knapsack which was strapped shut and which Roach identified as his. Amen grabbed the sack and told Roach he wanted to look in it for weapons. Roach said he did not want Amen to look in the sack, attempted to pull it away from him, and resisted surrendering it. However, both Amen and Bashus told Roach that Amen was going to look in the sack before turning it over to him. At that point, Roach let go of the sack.

Upon looking in the sack, Amen discovered a brown plastic pipe with a burnt residue, leading him to think that the pipe had been used for "ingesting some type of controlled substance." Amen also found a "22, semi-automatic" in the sack. Amen then told Roach that he was under arrest "for drug parapharnalia [sic], along with a concealed weapon."

By this time another officer, Solano, had arrived at the scene, and a search of the basement bedroom was conducted. This search led to the discovery on the floor under the desk of a kitchen plate having a creamy, white-colored substance stuck to it and containing a cotton ball. Solano inspected the kitchen, found a container of ice cubes, and concluded that some "cooking operation" had been conducted in the kitchen and that the ice cubes had been used for cooling something. In addition, Amen formed the opinion Roach and Brown were attempting to smoke some controlled substance in the basement.

Having been told that "the party in my car was getting extremely nervous," Amen transported Roach to the jail, where he was again searched and "nothing else of any significance" was found, except for eight or nine $20 bills, together with several $10 and $5 bills. Amen also again searched Roach's knapsack and found a green leafy substance which Amen thought to be marijuana, a green piece of paper in which was wrapped a hard, white creamy substance, a "baggy" containing a white powdery substance, and a small glass vial.

At 2:40 a.m., after being delivered to the jail, Roach was read his *Miranda* rights, whereupon he said he did not want an attorney and would talk with Amen. Roach repeated that he had just given Brown a ride and claimed to know nothing else. He admitted that the gun found in the sack was his and produced a bill of sale for it dated in 1987, but denied knowing anything about the other items found in the sack, explaining that he always carried it with him and had had the sack in his car. He admitted Brown had something on the desk and scraped it off when Amen walked in, but denied knowing what it was. He also denied burning anything "in there."

Laboratory analyses proved the residue on the kitchen plate to be cocaine and certain of the items taken from the knapsack to contain cocaine and psilocyn, controlled substances under the provisions of § 28-405 [Schedules I(c)(14) and II(4)].

Roach claims the search of his knapsack at the Simpson residence was unlawful and that, as a consequence, all the items seized from the sack and the statements he subsequently made should have been excluded from the evidence, as the seizures and statements all flowed from the unlawful initial search.

Roach's claim is meritless if the search was within the scope of searches which may be conducted incident to a lawful arrest and if Roach's arrest was itself lawful. A peace officer may arrest a person without a warrant if the officer has reasonable cause to believe that such person has committed a misdemeanor and may destroy or conceal evidence of the commission of such misdemeanor. Neb. Rev. Stat. § 29-404.02(2)(c) (Reissue 1985). When a law enforcement officer has knowledge, based on information reasonably trustworthy under the circumstances, which justifies a prudent belief that a suspect is committing or

has committed a crime, the officer has probable cause to arrest without a warrant. *State v. Blakely*, 227 Neb. 816, 420 N.W.2d 300 (1988). See, also, *State v. Robinson*, 233 Neb. 729, 448 N.W.2d 386 (1989).

Probable cause exists where facts and circumstances within an officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to warrant one of reasonable caution to believe that an offense has been or is being committed. If the facts available to the officer at the time of the arrest would warrant one of reasonable caution in the belief the action was appropriate, then probable cause exists. Thus, the key to a lawful arrest without a warrant is reasonable or probable cause to believe that a person has committed a crime. *State v. Moore*, 226 Neb. 347, 411 N.W.2d 345 (1987).

Probable cause for a warrantless arrest exists if, " 'under the totality of the facts and circumstances known to the arresting officer, a prudent person would have concluded that there was a fair probability that the suspect had committed a crime.' " *United States v. Fixen*, 780 F.2d 1434, 1436 (9th Cir. 1986); *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983).

The validity of a search incident to a lawful warrantless arrest depends on the legality of the arrest itself. It is not necessary that an actual formal arrest occur before a search is undertaken, as long as probable cause for arrest does exist prior to the search. The constitutional issue regarding a reasonable search as an incident to arrest depends upon the presence or absence of probable cause for that arrest, that is, whether immediately before the search an officer has probable cause to believe that the person to be searched has committed a crime. *State v. Blakely, supra.*

In the present case, Simpson summoned the police to her home and informed Amen and Bashus that she believed Brown and Roach were using drugs. In this situation, the information which Simpson provided contained sufficient indicia of reliability to warrant the officers' further investigation into the possibility that she could be correct in her belief. See, *State v. Ege*, 227 Neb. 824, 420 N.W.2d 305 (1988); *State v. Blakely, supra*. When the officers attempted to enter the room which

Brown and Roach occupied, a chair blocked the door, and Amen observed Brown scraping something off the desk at which Roach was seated. In addition, Roach lit a cigarette in an apparent effort to mask a preexisting burning odor, and there was evidence of something having been cooked prior to the officers' arrival. Under the totality of the circumstances presented to the officers, probable cause existed to arrest Brown and Roach for the illegal possession and use of a controlled substance before the knapsack was searched.

The record indicates that Amen in fact believed that Brown and Roach were smoking a controlled substance in the basement of Simpson's residence. However, because Amen and Bashus were at one point apparently prepared to allow Roach to leave, and because Amen, in formally arresting Roach, recited that he was arresting him "for drug parapharnalia [sic], along with a concealed weapon," it could be contended that Amen did not know he had probable cause to arrest Roach. Nevertheless, the validity of an arrest and the permissibility of a search incident thereto are premised upon the existence of probable cause, not the officer's knowledge that probable cause in fact does exist. *United States v. Moses*, 796 F.2d 281 (9th Cir. 1986), citing *Florida v. Royer*, 460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). See, also, *State v. LaChappell*, 222 Neb. 112, 382 N.W.2d 343 (1986).

Nor does it matter that Roach was not "formally" placed under arrest until after his knapsack was searched.

> "[W]here the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than visa [sic] versa [as long as] . . . the fruits of the search of petitioner's person were, of course, not necessary to support probable cause to arrest petitioner."

*U.S. v. Tavolacci*, 704 F. Supp. 246, 251 (D.D.C. 1988), quoting *Rawlings v. Kentucky*, 448 U.S. 98, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980). See, also, *State v. Blakely, supra*.

Amen had probable cause to arrest Roach prior to his search of the knapsack, and such probable cause permitted the search if the search was within the permissible scope of searches

conducted incident to an arrest.

*New York v. Belton*, 453 U.S. 454, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981), discusses the permissible scope of such a search. The opinion states at 453 U.S. at 457-59:

> [T]he Court held in *Chimel v. California*, 395 U. S. 752, that a lawful custodial arrest creates a situation which justifies the contemporaneous search without a warrant of the person arrested and of the immediately surrounding area. Such searches have long been considered valid because of the need "to remove any weapons that [the arrestee] might seek to use in order to resist arrest or effect his escape" and the need to prevent the concealment or destruction of evidence. *Id.*, at 763.
>
> The Court's opinion in *Chimel* emphasized the principle that, as the Court had said in *Terry v. Ohio*, 392 U. S. 1, 19, "[t]he scope of [a] search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." Quoted in *Chimel v. California, supra*, at 762. Thus while the Court in *Chimel* found "ample justification" for a search of "the area from within which [an arrestee] might gain possession of a weapon or destructible evidence," the Court found "no comparable justification . . . for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself." 395 U. S., at 763.
>
> Although the principle that limits a search incident to a lawful custodial arrest may be stated clearly enough, courts have discovered the principle difficult to apply in specific cases. . . .
>
> . . . .
>
> So it was that, in *United States v. Robinson*, 414 U.S. 218, the Court hewed to a straightforward rule, easily applied, and predictably enforced: "[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." *Id.*, at 235. In so holding, the

Court rejected the suggestion that "there must be litigated in each case the issue of whether or not there was present one of the reasons supporting the authority for a search of the person incident to a lawful arrest." *Ibid*.

The *Belton* decision then held that police officers making a lawful arrest of an occupant of an automobile could examine the passenger compartment of that automobile and that such officers could also examine the contents of any containers found within the passenger compartment.

The Court stated at 453 U.S. at 461:

Such a container may, of course, be searched whether it is open or closed, since the justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have. Thus, while the Court in *Chimel* held that the police could not search all the drawers in an arrestee's house simply because the police had arrested him at home, the Court noted that drawers within an arrestee's reach could be searched because of the danger their contents might pose to the police. 395 U. S., at 763.

. . . "The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." [*United States v. Robinson*,] 414 U.S., at 235.

Because *Belton* involved the search of the passenger compartment of an automobile, it could be argued that the warrantless search of a container (such as a knapsack) incident to a lawful arrest is limited to cases in which the "automobile exception" is applied. However, a closer review of *Belton* reveals that such an argument is not valid.

It is true that the first paragraph of *Belton* states the

following: "When the occupant of an automobile is subjected to a lawful custodial arrest, does the constitutionally permissible scope of a search incident to his arrest include the passenger compartment of the automobile in which he was riding? That is the question at issue in the present case." *New York v. Belton,* 453 U.S. 454, 455, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981). But despite this opening paragraph, it must be noted that in *Belton,* the Court allowed the search of the zipped pocket of the arrestee's leather jacket. The arrestee was not wearing the jacket, and the passengers had gotten out of the vehicle. The Court stated at 453 U.S. at 462-63:

> The jacket was located inside the passenger compartment of the car in which the respondent had been a passenger just before he was arrested. The jacket was thus within the area which we have concluded was "within the arrestee's immediate control" within the meaning of the *Chimel* case. The search of the jacket, therefore, was a search incident to a lawful custodial arrest, and it did not violate the Fourth and Fourteenth Amendments.

The opinion states at 453 U.S. at 462-63 n.6: "Because of this disposition of the case, there is no need here to consider whether the search and seizure were permissible under the so-called 'automobile exception.' *Chambers v. Maroney,* 399 U. S. 42; *Carroll v. United States,* 267 U. S. 132."

In addition, numerous decisions from various federal courts have relied upon *Belton* to permit warrantless searches of containers incident to a lawful arrest in situations where the "automobile exception" was entirely inapplicable. See, e.g., *United States v. Porter,* 738 F.2d 622 (4th Cir. 1984), *cert. denied* 469 U.S. 983, 105 S. Ct. 389, 83 L. Ed. 2d 323 (warrantless search of a carry-on bag at an airport); *United States v. Litman,* 739 F.2d 137 (4th Cir. 1984) (warrantless search of a shoulder bag in a hotel room); *United States v. Fleming,* 677 F.2d 602 (7th Cir. 1982) (warrantless search of a paper bag in the immediate area of the defendant upheld despite the fact that at the time of the search defendant was handcuffed); *United States v. Herrera,* 810 F.2d 989 (10th Cir. 1987) (warrantless search of a briefcase carried by arrestee); *U.S. v. Tavolacci,* 704 F. Supp. 246 (D.D.C. 1988) (warrantless

search of luggage at a railway station).

Other decisions, although not relying specifically upon *Belton*, have also permitted warrantless searches of personal baggage incident to a lawful arrest. See, e.g., *U.S. v. Andersson*, 813 F.2d 1450 (9th Cir. 1987) (warrantless search of a suitcase in a hotel room).

In addition, the U.S. Court of Appeals for the Eighth Circuit has relied upon *Belton* and *Chimel v. California*, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969), to permit the warrantless search of personal baggage. E.g., *United States v. Garcia*, 785 F.2d 214 (8th Cir. 1986), *cert. denied, Barker v. United States*, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342; *U.S. v. Valiant,* 873 F.2d 205 (8th Cir. 1989), *cert. denied* ____ U.S. ____, 110 S. Ct. 117, 107 L. Ed. 2d 78 (each involved a search of the passenger compartment of an automobile and a briefcase which was found inside).

Accordingly, Amen's search of the knapsack did not violate Roach's protection against unreasonable searches and seizures, and the district court properly overruled Roach's trial objections to the receipt of the evidence obtained by that search.

AFFIRMED.